examination by a competent surgeon before a referee named by this court is therefore granted.

Motion granted.

---

(22 App. Div. 428.)

### In re ROGERS et al.

(Supreme Court, Appellate Division, Second Department.    November 30, 1897.)

1. WILLS—CONSTRUCTION.
   No effect can be given to the intent of a testator, as set forth in his will, that a remainder-man should receive as principal that which, as a strict matter of law, would be income, for the disposition is, in effect, an accumulation which, except when exclusively for infants during minority, is wholly void.

2. CORPORATIONS—DISTRIBUTION ON DISSOLUTION.
   In the case of a distribution of the assets of a corporation on its dissolution, when the corporation does not decide whether they are capital or income, all dividends in liquidation are not necessarily capital, as between life tenant and remainder-man, and it is permissible to show what, if any, portion proceeded from profits, and what from capital.

3. SAME—RIGHTS AS TO STOCK HELD IN TRUST.
   Testator left certain corporate stock in trust for life beneficiaries, with remainder over.  Twenty-five years later upon the dissolution of the corporation, its assets exceeded twenty-fold the original investment, the accretions consisting of accumulated profits.  It transferred to a new corporation, in exchange for the latter's stock, its plant, stock on hand, and good will.  It then distributed among its stockholders the new stock, and a large amount of cash, and securities owned by it.  *Held*, on an accounting by the trustees, that the stock of the new company divided represented capital still to be employed in substantially the same enterprise as at the creation of the trust, while the cash and securities divided were profits, and were turned over to the stockholders as such.

Appeal from surrogate's court, Westchester county.

Judicial settlement of the account of Thomas Rogers and William Cauldwell, trustees under the will of James Rogers, deceased.    From the decree of the surrogate all of the parties appeal.    Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Rastus S. Ransom, for trustees.

Hammond Odell, for Jason Rogers and Jay C. Rogers.

Hamilton Wallis, for Mary J. Westerfield and Flora E. Rogers.

CULLEN, J.    This proceeding is an accounting by the trustees under the will of Jason Rogers, who died August, 1868, leaving three children, namely, Thomas Rogers, one of the trustees, Mary J. Westerfield, and Flora E. Rogers.    By his will the testator gave to his trustees certain specified securities on separate trusts for each of his daughters.    The trust was to apply so much of the income as might be proper and necessary for the support and education of the daughter, not exceeding $800 a year while under the age of 12 years, and not exceeding $1,500 a year after the age of 12 years, until such daughter should arrive at the age of 21 years or marry.    All accumulations during the minority of the daughter were to be added to the principal of the trust estate.    From the time the daughter should arrive at the age of 21 or marry, continuing for the remainder of her natural life, the whole income or interest of the trust estate was to be paid to her,

and upon the death of the daughter the trust estate to be equally divided among her children, or, in default of children, then to fall into and be part of the testator's residuary estate, the ultimate distribution of which, so far as the question involved in this litigation is concerned, it is unnecessary to state. Among the securities given in trust for the benefit of a daughter were 50 shares of the capital stock of the Rogers Locomotive & Machine Works, of Patterson, N. J., of the par value of $100 each. In an inventory of the testator's estate the shares were appraised at the value of $125 each. The Rogers Locomotive Works was originally incorporated by a special act of the legislature of New Jersey in 1838, under another name, with a capital of $300,000. In 1856 the title of the corporation was changed to that named in the testator's will. In 1867 it was authorized to increase its capital stock to amount not exceeding two millions of dollars, which authority was never availed of. The corporation continued to carry on its business until 1893. It has paid during the time of the trust dividends of 10 per cent. semiannually. So successful was its management that, when it ceased to do business, it had large and valuable buildings and plant devoted to manufacturing purposes, and an extensive stock of material, on hand. It had also large funds in cash, bonds and stocks of the United States, bonds of other corporations, and real estate located in other states. At this time another corporation, called the Rogers Locomotive Company, was organized, with an authorized capital of three millions of dollars, apparently for the purpose of acquiring the property of the locomotive and machine works. The old company transferred all its works, buildings, plant, stock on hand, and good will for $2,750,000 in the stock of the latter company. Thereupon the original corporation proceeded to liquidate. On March 7, 1893, the directors of the company directed that a dividend be made to the stockholders of ten shares of the stock of the new company on every one share of the stock of the old company. This was followed on May 27th by a division to the stockholders in kind of the stock of various railroad companies, and later still by cash dividends and still another dividend of Rogers Locomotive Company stock. Altogether there appears to have been distributed to the holder of each share of stock 1,144 per cent. in stock of the new company, 1,000 per cent. in cash, and 175 per cent. in railroad stock. The controversy in this case is between the life tenant and the remainder-men over the fund so distributed. The learned referee before whom the case was first heard held that the whole fund was to be treated as capital or as part of the corpus of the trust estate, and that the life tenant was entitled to no share of it. The learned surrogate modified the report of the referee, holding that 100 per cent. of the cash dividend and the dividends of the stock of the Rogers Locomotive Company were capital, and that the remainder of the cash dividends and the dividend of railroad stock were profits or income to which the life tenant was entitled. From the decree entered on this decision all parties have appealed.

Very elaborate opinions were rendered by the referee and the surrogate. In those opinions is to be found a review of nearly every decided case bearing upon the question of the respective rights of life tenants and remainder-men in dividends made by corporations.

Many of these authorities, though instructive, do not bear strongly on the precise question now before us. As to those cases, it is unnecessary to add anything to the discussion found in the opinions below. The learned referee seems to have been largely influenced. if not actually controlled, in the decision which he reached, by what he regarded as the intent of the testator as displayed in various parts of the will. In many of the cases is to be found the statement that such intent should be made effectual in determining this much-vexed question. I think, however, the principle is not of universal application. The proposition that the testator's will on this subject is to control is true or false, depending on the direction in which that intention. is manifested. If, from the will of the testator, it is apparent that he intended that the life tenant should receive as income that which, as a strict matter of law, would be principal. undoubtedly that intent should govern, for the testator had the right to give the life tenant the power to consume the. whole principal. Such was the case of In re James, 146 N. Y. 78, 40 N. E. 876. But, if the intent is in the opposite direction,—that that which the law holds to be income shall be treated as principal, and go to the remainder-men,—it is, in effect, an accumulation, and wholly void. Our laws forbid accumulation except for the benefit of infants in being during their minority. No principle of public policy declared by our statute law has been more firmly and rigidly upheld by the courts than this inhibition against accumulations. The accumulation must not only be for infants, but it must be exclusively for infants, so much so that, if an adult or person not in being is to share in the accumulation, then a trust for the accumulation is void. Boynton v. Hoyt, 1 Denio, 54; Kilpatrick v. Johnson, 15 N. Y. 326. The very provision of the testator's will upon which the referee and the counsel for the remainder-men lay so much stress as evincing the testator's intent, to wit, that the accumulations, during the minority of the life tenant, should not go to that life tenant, but become part of the principal of the trust estate, was void (Pray v. Hogeman, 92 N. Y. 508), and the life tenant was entitled to those accumulations whether in fact she has received them or not. The rule doubtless is "that the intentions of a testator shall prevail if they are consistent with each other, and conformable to the principles of law." But, if a testator's intent is to make that principal which is income in the case of a trust of the nature of the one before us, such intent is not in conformity with law, but in express contravention of it. Therefore the right of the remainder-men in this fund must rest on the legal character which the law impresses on the fund, and not on any intent of the testator. While the corporation continues to do business, or, as is sometimes said, is a going concern, the law is settled in this state that a cash dividend is income, and goes to the life tenants, no matter at what time the profits from which the dividend was declared may have accrued or have been accumulated. In re Kernochan, 104 N. Y. 618, 11 N. E. 149. In that case was cited with approval the declaration in Sproule v. Bouch, 29 Ch. Div. 635: "In a word, what the company says is income shall be income, and what it says is capital

48 N.Y.S.—12

shall be capital." The concensus of authority without this state
would seem to establish, as a general rule, that stock dividends
are not income or profits, but are capital. Gibbons v. Mahon, 136
U. S. 549, 10 Sup. Ct. 1057; Spooner v. Phillips, 62 Conn. 62, 24
Atl. 524; In re Brown, 14 R. I. 371; Minot v. Paine, 99 Mass. 101;
Rand v. Hubbell, 115 Mass. 461. The question does not seem to
have been determined by the highest court of this state, and in
the lower courts there seems to be some conflict of authority. Clark-
son v. Clarkson, 18 Barb. 646; Simpson v. Moore, 30 Barb. 637;
Goldsmith v. Swift, 25 Hun, 201. But neither rule seems to have
controlling effect in the disposition of the case before us. It is very
clear that a dividend of the stock of other corporations is in no
respect a stock dividend, as the term is usually employed; i. e. an
increase of the nominal capital stock of the shareholders of a com-
pany. It is precisely the same as a dividend of cash, because the
corporation might have sold the stock, and divided the money among
its shareholders. In a stock dividend no money or property is with-
drawn from the ownership and control of the corporation. But, if
the dividend be in cash or in the stock of other corporations, in
either case just so much property is taken from the corporation,
and the title to it vested in the shareholders individually. To give
the first rule any bearing on the subject before us, it must be shown
that the principle that "what the company says is income shall be
income, and what it says is capital shall be capital," is applicable
to a case where capital and profits alike are distributed, where the
company no longer retains any capital, and where its statement as
to the distinction between capital and profits, unless supported by
the facts, is its mere arbitrary declaration, since it has no further
interest in the subject-matter. It is this which, in my judgment,
constitutes the radical distinction between a declaration of a divi-
dend by a going concern and a declaration by a liquidating corpo-
ration. When the former declares a dividend, the title to the money
is taken from the corporation, and vested in the shareholder.
Whether rightly or wrongly declared, as a matter of fact the money
is separated from the share of stock. It is no longer a part of the
capital of the company. When, however, a division is made of the
assets of a liquidating concern, there is no actual separation of the
funds of one class, representing profits, from those of the other
class, representing capital. Both are paid over to the stockholders.
The rule that the courts will not look to see from what source the
dividend has been paid is a rule of convenience more than one of ab-
solute justice. In certain states, as in Pennsylvania, the rule is
repudiated. In Vinton's Appeal, 99 Pa. St. 434, it is said:

"The rule * * * is a very simple and convenient one, and may relieve trus-
tees and courts of much trouble, but it is certainly not one that commends itself
for its justice and equity. * * * To us it seems like a bungling rule of law
that at one time would give what is indisputably income to the remainder-man,
and at another what is clearly capital to the life tenant."

I imagine that in an instance of a dividend made by a going con-
cern, the dividend might proceed to such an extent from the alien-
ation of the capital or of the franchise of the company as to shock

the sense of justice, and to make it an exception to the rule even in this state. The rule of convenience, however, has no great force when applied to a liquidating concern. As already stated, it is not the concomitant or result of any action on the part of the corporation, but the mere declaration of the directors of what part of the assets represents capital, and what part profits. This determination certainly can be made by the courts as easily, and probably more justly, than by the corporation. But to support the claim of the life tenant in this case it would be necessary to show that the corporation had acted on the subject-matter when it distributed its assets, and declared what part was profits and what part capital. I have not recited the terms of the various resolutions declaring the dividends. They appear to proceed on no fixed principle. The language of the resolutions varies. Some of them would seem conclusive that the corporation regarded all of the property distributed beyond a single dividend of 100 per cent. in cash as a dividend of profits; others would seem equally conclusive to the contrary. It is impossible for my mind to find in them any certain principle of action or declaration.

At this point it is necessary to notice the claim of the counsel for the trustees and remainder-men. Their contention, as I understand it, is that a distribution or dividend by a liquidating corporation is, as a matter of law, wholly principal or capital, and no part of it income or profits. The authorities in the state of Massachusetts sustain this proposition, but I can find none outside of that state to support it. In Gifford v. Thompson, 115 Mass. 478, a part of the corpus of the trust fund was invested in the stock of the New Bedford & Taunton Railroad Corporation. Under an act of the legislature that corporation sold all its franchises and property, and, being about to wind up its affairs, and dissolve, declared a dividend of $150 per share. It was averred that as much as $50 per share out of the dividend of $150 proceeded from undivided earnings since the creation of the trust. It was held that such undivided earnings were part of the capital, and not of the income, of the share, and that the legatee for life was not entitled to them. The report of the facts of the case is meager, and it does not appear whether the undivided earnings had gone into the road and rolling stock, or whether they existed in the shape of moneys. In Richardson v. Richardson, 75 Me. 570, the question presented had no resemblance to that before us, and the case requires no discussion. In Lord v. Brooks, 52 N. H. 72, the law was held exactly the reverse of that declared by the courts of Massachusetts. In this case the principal of a trust fund had been invested in the stock of two banks. At the expiration of their charters these banks retired from business, and their assets were divided among the shareholders. On the distribution there was a surplus in excess of the capital, which had accrued from undivided profits. It was held that the equitable life tenant was entitled to such surplus as against the remainder-men. This case is not in conflict with the earlier one of Wheeler v. Perry, 18 N. H. 307. In the latter case part of the trust fund was invested in shares of a corporation which sold out its prop-

erty, and ceased business. The par value of the shares was $500 each. The amount realized on liquidation was $1,525. It was held. that the whole of the dividends in liquidation went to capital, not to income. But it is to be observed that this decision proceeded on the fact that at the time of the death of the testator and creation of the trust the shares were worth the sum of $1,500 each. The two cases of Gifford v. Thompson and Lord v. Brooks are the only authorities I find upon the precise. question before us, and, as they are in direct opposition, one may be considered fairly to offset the other. It becomes necessary, therefore, to consider the question on principle.

At the outset of the discussion the inquiry is presented, on what ground is the claim made that all dividends in liquidation are necessarily capital? I can find no distinct basis for this claim presented in the brief of the learned counsel for the trustees and remainder-men. Citations are made from the text-books, but they do not touch the point in dispute. The one nearest approaching the inquiry is that from Mor. Priv. Corp. §§ 443, 467:

"Upon winding up a corporation, the entire capital, after paying the company's debts, must be distributed among the shareholders. In this case the rules governing the distribution of profits and payment of dividends have no application." "It is clear that the amount distributed by a corporation among its shareholders on winding up its business and making a final division of the corporate assets is not in any sense 'income and profits' on the shares."

The propositions of both these sections may be granted,—that the rule governing the payment of dividends has no application when a corporation winds up business, and makes a final division of its assets, and that such division is not income and profits on the share. But it by no means follows that it is capital. All that the statement cited means is that such dividends, simply because they are dividends, are not necessarily profits. If the learned author intends to assert more than this, the statement is without argument or authority for its support other than the Massachusetts case referred to. The discussion in the Massachusetts case is extremely brief. It is held that:

"The earnings of the corporation remained, while undivided, part of the capital of the corporation; and the interest therein, represented by each certificate of a share of stock, was part of the capital, and not of the income, of that share, as between those entitled to successive rights in it. The vote of the corporation, in substance and intent, as manifested upon its face, was not a division of earnings, profits, or income, as such, among the owners of shares, which were to continue to exist, but a winding up of all the affairs of the corporation, and an apportionment and distribution of all its property as capital, though in the shape of money, among the stockholders, in exchange for their shares, and upon the surrender of their certificates."

This decision would seem to proceed not on the ground that the corporation could not, at the time of final dissolution, divide profits as profits and capital as capital, but that in the particular case there had been only made a division of capital. This doctrine might lead the counsel into very great danger in case the contention of his adversary should prevail, that the corporation has assumed to divide all its assets as profits, with the exception of a cash dividend of $100 in return for the original investment. On the other hand,

it seems to me that there are very grave objections to the adoption of a rule that the whole of the assets of a corporation, upon liquidation, should, under all circumstances, go to the remainder-men. The equities of a life tenant to receive the whole income that may accrue during his tenancy are every whit as great as that of the remainder-men to have the corpus of the trust preserved unimpaired. I am unable to appreciate the sentiment that occasionally crops out in judicial opinions, that the integrity of the trust fund has greater sanctity than the interest of the life tenant. In Irving v. Houstoun, 4 Pat. App. 521, the court seems to have been shocked at the idea "that the life renter should run away with a bonus that may have been accumulating on the floating capital for half a century"; but to me the notion that the remainder-man should obtain the profits that had accumulated during the tenancy for a quarter of a century by the life tenant, and of which he had been deprived, seems equally objectionable. Why should the life tenant fast for 25 years that the remainder-man may feast at the end of that period? Why should each not have exactly his own, so far as it is possible to ascertain it? There is this further consideration to be borne in mind: An increase of the corpus of a trust fund by accumulations from the income, except for the benefit of infants, is against public policy, and expressly condemned by the statute. The value of the corpus may be increased by the appreciation in the value of the subject of the trust. A piece of real property, devised in trust, might greatly rise in value, and of this the remainder-men would get the full benefit. But no outlay for an extraordinary improvement could be made out of the income of the property. In re Nesmith, 140 N. Y. 609, 35 N. E. 942. The only way that this provision against accumulations can be avoided (I do not say evaded) is through the medium of a corporation, for there the legal ownership by the corporation is interposed between the shareholder and the property. Technically, though also legally, the specific thing which is the subject of the trust is not an interest in the property of the corporation, but in the shares of the corporation. The identity of the subject-matter of the trust therefore remains the same, though its value may be vastly enhanced by accumulations from income or profits, which would not be permitted in a case of the bequest or devise of specific property or specific funds. It would be impracticable, or at least extremely inconvenient, to attempt to obviate this injustice to a life tenant in the case of the stock of a corporation continuing to do business. But where the corporation has ceased to do business, and distributed its assets, the objection of inconvenience has no particular force; and, while it would not be correct to say that in all cases every excess of the amount distributed above the amount originally invested was to be treated as arising from accumulated income and profits, it would be equally erroneous to adopt a rule which would prohibit any inquiry into the source from which such surplus had accrued. We think, therefore, that in the case of the distribution of the assets of a corporation on its dissolution it is permissible to show what, if any, portion of the sums distributed proceed from profits, and what from capital.

In the particular case before us it appears that the assets of the corporation at the time of its termination exceeded twentyfold the original investment. These assets consisted of a large property, plant, and stock on hand. In addition to such stock and plant, the company was possessed·of cash and securities equal to nearly 12 times the original investment. Mr. Rogers, the president of the company for many years, and a brother of the testator, testified that this great increase in the assets of the corporation proceeded from undivided profits. The learned referee criticised this testimony as being a conclusion; but, in our opinion, if a conclusion, it is one amply justified by the facts. As shown by the diagram put in evidence, the company retained until the last the land on which the factory and shops were situated. The buildings and shops were erected from time to time as the business of the company increased and it became more prosperous. The company made no fortunate speculation in lands or securities. It had at its liquidation $300,000, being the original investment, and, beyond that, the further sum of $2,700,000 in cash, $525,000 in railroad securities, and its original real property, shops, and plants, not only intact, but greatly extended. I am at a loss to conceive of any source from which these great accretions could have come except from the accumulated profits of the company. It may be that the bookkeeping of the corporation might have been more complete, but the stockholders were very much more interested in the result of the business than they were in the character of the bookkeeping. The bookkeeping might have been better, but the profits might have been far less. The latter was the substantial matter to the stockholders. On this statement it appears that of the assets of the corporation nearly one-half, or some three millions of dollars, was not in use as what I may term "active capital." Before its conversion into cash, it appears to have been principally invested in securities. It may have been a wise and prudent thing to retain this large sum as a reserve fund on which drafts might be made in case of any misfortune in the. conduct of the business. Such funds are provided in some cases, but in the great majority of cases they would have been divided among the stockholders. Had the company, before transferring its plant to the new corporation, distributed this whole surplus or .reserve fund among its stockholders, it would have gone to the life tenant, and no well-founded complaint could have been made that such a dis-' tribution was either illegal or inequitable. Now, if we disregard the form and look at the substance of what was done when the original corporation liquidated, it will appear that, while the corporation technically went out of business, the real parties in interest, the stockholders, did not go out of business. The corporation might have divided what I have called its reserve fund among its stockholders; it might have increased its capital stock tenfold by a stock dividend. For some reason, instead of doing this directly, it appears to have preferred to do·it by the creation of a new corporation. But the substantial result is practically the same as that suggested. As far as I can gather from the case, the new corporation is substantially the old one. The whole plant, stock, and business

of the old company as a going concern is transferred to the new, and I do not see that the new company has any other stockholders than those of the old; and the holdings of the stockholders, while increased in amount, bear the same relation to each other as they did in the old company. In my opinion, the learned surrogate was correct when he held that the stock of the new company divided represented capital still to be employed in substantially the same enterprise and business in which it was invested at the time of the creation of the trust, changed in form, but not in substance; while the cash and securities divided were profits theretofore accumulated, but from that time released from the hazards of the business, and turned over to the stockholders as profits. One hundred per cent. of the cash dividends, being the amount of the original investment, was held by the surrogate to form part of the capital of the trust estate in addition to the stock of the new corporation. The life tenant took no exceptions to the decision of the surrogate in this respect, nor has the decision been assailed on this appeal. It is unnecessary, therefore, to discuss whether this amount was properly awarded to principal or income.

The decree of the surrogate should be affirmed, with costs to all parties, payable out of the fund. All concur.